**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DEBORAH NAGY, et al., | |
| Plaintiffs, | Civil Action No. 19-18277 (RK) (DEA) |
| v. | **OPINION** |
| OUTBACK STEAKHOUSE, et al. | |
| Defendants. | |

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court upon a Motion for a New Trial filed by Defendant Outback Steakhouse, ("Defendant" or "Outback"). ("MNT," ECF No. 135.) This case involves an incident that occurred on October 18, 2018 at an Outback in Green Brook, New Jersey. Deborah Nagy, ("Mrs. Nagy" or "Plaintiff"), slipped and fell while walking to the restroom, breaking her left hip and femur. Mrs. Nagy and her husband, Roger Nagy, ("Mr. Nagy") (collectively, "Plaintiffs"), brought suit against Outback for damages resulting from Mrs. Nagy's injury. This case went to a jury trial on March 25, 2024. After a three and a half day trial, the jury returned a verdict for $2.5 million as to Mrs. Nagy for her pain and suffering, disability and impairment, and loss of enjoyment of life and for $250,000 as to Mr. Nagy for his loss of spousal services, loss of companionship and comfort, and loss of marital relations. Thereafter, Defendant filed the Motion for New Trial now pending before the Court. The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion is **DENIED**.

I.    **BACKGROUND**

Before addressing the issues raised in Defendant's Motion, it is incumbent upon the Court to present a full record of the events leading up to and during the course of the trial in this matter.

A.    FACTUAL BACKGROUND

As noted above, this case arises from a slip and fall which occurred at an Outback Steakhouse in Green Brook, New Jersey on October 18, 2018. (*See* "Compl.," ECF No. 1-4.) Plaintiff was out to dinner with her husband and their friends, Melanie and Lee Dombrowski ("Mr. and Mrs. Dombrowski"), when she slipped and fell while walking to the restroom. (*See* "Trial Tr. Day 2," ECF No. 138 at 93–97, 126–128, 163–165.) Thereafter, Plaintiff remained on the floor until emergency services arrived and transported her from Outback to Robert Wood Johnson University Hospital in Somerset, New Jersey. (*Id.* at 97–98, 128–29, 165–167.) Plaintiff suffered a displaced and comminuted fracture of her left upper femur, also referred to simply as the hip, meaning that her hip was fractured in multiple pieces. (*Id.* at 69, 168; *see also* "Trial Tr. Day 3," ECF No. 139 at 279, 283.) The next day, a representative from Outback contacted Plaintiff, who advised Outback that she had been hospitalized and was awaiting surgery. (*See* Mem. Op., ECF No. 89 at 2.) Plaintiff underwent "open reduction internal fixation surgery" to repair her fracture, after which she remained in the hospital for another three days. (Trial Tr. Day 2 at 171; Trial Tr. Day 3 at 288.) Thereafter, she was transferred to an inpatient rehabilitation facility where she remained for another five days. (Trial Tr. Day 2 at 103, 171–73.) Plaintiff spent about ten days in total at the hospital and rehabilitation facility. (*Id.* at 173.)

Video footage of Plaintiff's fall was captured on Outback's surveillance camera, which, shows Plaintiff slipping and falling directly outside the restaurant's kitchen where servers can be seen entering and exiting with food and beverages. (*See* Mem. Op. at 2.) As described in greater

detail below, Defendant produced, in installments spanning five months, its surveillance video which only captured approximately five minutes before Plaintiff's slip and fall even though Outback's own policy requires its personnel to survey and ensure its premises are safe for its patrons and employees every 15 minutes.

### B.    RELEVANT PROCEDURAL HISTORY AND PRE-TRIAL MOTIONS

Plaintiffs filed suit against Defendant on January 21, 2019—over five years ago—in the Superior Court of New Jersey, Law Division, Middlesex County. (*See* Compl.) Outback removed this action to federal court on September 24, 2019. (ECF No. 1.) Thereafter, the parties engaged in discovery and attempted unsuccessfully to resolve this case through arbitration. (*See* ECF Nos. 15, 24, 30, 44, 46.) On September 26, 2022, Plaintiffs filed a Motion for a Finding of Spoliation pertaining to Defendant's failure to preserve additional surveillance footage of the time period prior to Mrs. Nagy's fall. (ECF No. 57.) Thereafter, the parties attended mediation, and this case, including Plaintiffs' Motion, was administratively terminated. (ECF No. 67, 79.) After attempts to mediate the matter failed, the parties attended a Settlement Conference with this Court, which was likewise unsuccessful. (ECF Nos. 78, 79.) On December 6, 2023, the Court reinstated Plaintiffs' Spoliation Motion, (ECF No. 81), which was handled by the Honorable Douglas E. Arpert, U.S.M.J. (ret.).

While Plaintiffs' spoliation motion was pending, on January 4, 2024, this Court issued a Pretrial Scheduling Order, which set this case for trial on March 25, 2024. (ECF No. 81.) The Court also scheduled a pretrial conference on March 12, 2024 and set forth instructions and deadlines for the parties' submissions in advance of same. (*Id.*) *Inter alia*, the Court ordered the parties to jointly submit the following documents by March 4, 2024: (1) a neutral statement of the

case; (2) a verdict sheet; (3) proposed voir dire questions; (4) jury instructions; (5) a witness list; and (6) an exhibit list. (*Id.* at 2–6.)

On February 21, 2024, Judge Arpert ruled on Plaintiffs' spoliation motion. (*See* Mem. Op.) He determined that Defendant should have preserved more than five minutes of surveillance footage prior to Mrs. Nagy's fall, that by selectively preserving more footage *after* Mrs. Nagy's fall, Defendant acted with intent to deprive Plaintiffs of the most relevant video footage, and that Plaintiffs were entitled to an adverse inference jury instruction. (*See generally id.*) As described in greater detail below, Defendant never filed objections to, nor otherwise appealed, Judge Arpert's Order.

On March 4th, the parties failed to provide the pretrial submissions as previously ordered by the Court and instead requested that the deadline for these submissions be extended to March 7th, which the Court granted. (ECF No. 102, 103.) However, on March 7th, the Court neither received the submissions nor an additional extension request from the parties. On March 8th, the Court received a letter from Defense counsel indicating that he did not receive Plaintiffs' portions of the trial submissions until the evening of March 7th, and thus indicated that the parties would endeavor to file their joint submissions over the upcoming weekend, or, at the latest, March 11, 2024. (ECF No. 109.)

On March 11th—the day before the pretrial conference—the Court received the parties' joint submissions. (ECF No. 110.) The submissions violated the Court's pretrial order in numerous ways. For example, the Court ordered the parties to file a joint exhibit list that identified (1) all stipulated exhibits that could be received without objection and (2) all remaining exhibits with a one-line statement of the legal bases for any objections. (ECF No. 81 at 5.) The pretrial order expressly stated: "Any objection(s) to an exhibit must be set forth or it shall be deemed waived."

4

(*Id.*) Nonetheless, the parties submitted a joint exhibit list that noted neither stipulations nor objections for any exhibits. (*See* "Pretrial Memo," ECF No. 110 at 3–8.)

On March 12th, the Court conducted a pretrial conference, at which time the Court addressed the parties' Motions in Limine and other pretrial submissions. (ECF No. 111.) During the conference, the parties advised the Court that they took video-recorded *de bene esse* testimony of Defendant's expert witness, Dr. Sean Lager, M.D. ("Dr. Lager"), on March 7, 2024; they noted that there had been objections throughout Dr. Lager's testimony, which they anticipated would require the Court's input before presenting the testimony to the jury. The Court instructed Defense counsel to order and expedite the production of the transcript from Dr. Lager's testimony and file any requisite motion immediately. (*See* "Trial Tr. Day 1," ECF No. 137 at 3–4.)

The Court also raised the issue of whether Outback intended stipulate to liability.[1] The Court made clear to Defense counsel that in the event that Outback decided to stipulate to liability, it should not do so at the eleventh hour, so as to not sandbag his adversary. (*See id.* at 4–5.) Defense counsel advised the Court that Outback did not intend to stipulate to liability but that if Outback changed its position, any such stipulation would be timely filed. (*Id.* at 5.) Nonetheless, on March 21st, the Thursday before the Monday morning on which trial was set to begin, Defendant filed a letter in which it indicated that it was indeed stipulating to liability "[i]n light of" Judge Arpert's ruling—which had been issued a month prior—that Plaintiffs were entitled to an adverse inference instruction. ("Stip.," ECF No. 113.) Plaintiffs' counsel filed a letter requesting an emergent telephone conference to resolve issues raised by Defendants' stipulation, such as necessary

---

[1] The Court also notes that this was not the first time it raised the issue of Outback's stipulation to liability in this matter. The Court raised the issue as early as December 4, 2023 during its Settlement Conference with the parties because, after reviewing the surveillance footage of the incident, which clearly shows Mrs. Nagy slipping and falling directly outside the restaurant's kitchen entrance, the Court anticipated that such a stipulation was likely. (ECF No. 79; *see also* Trial Tr. Day 1 at 4–5.)

changes to the neutral statement of the case, jury instructions, and verdict sheet as well as the scope of evidence that Plaintiffs would be permitted to present at trial. (ECF No. 114.)

The Court held a telephone conference the next morning. (ECF No. 115.) The Court instructed the parties to submit amended versions of the neutral statement of the case, jury instructions, and verdict sheet. (*See* "TC Tr.," ECF No. 141 at 2, 9–10.) The Court also explained that, notwithstanding the stipulation of liability, Plaintiffs were entitled to present a full narrative of the incident that occurred and would not be forced to put on a "sterile presentation." (*Id.* at 11.) For example, the Court explained that Plaintiffs would be entitled to elicit testimony that Mrs. Nagy fell on a greasy substance while walking to the bathroom and that her dining companions, who came over to assist her, observed her in a state of distress and pain. (*Id.*)

Also during the telephone conference, Defense counsel represented that they had received the transcript from Dr. Lager's video-recorded testimony on Monday, March 18th and that Defendant still intended to file a motion regarding objections raised during certain portions of that testimony. (*Id.* at 15.) The Court advised Defense counsel that Defendant may not prevail on the motion if it were to be filed "at the last minute." (*Id.* at 15–17.) Nonetheless, at 4:57 p.m. on Friday, March 22nd—before this case was scheduled to go before a jury on Monday morning—Defendant filed a "Motion for Ruling Regarding Objections Made During the March 7, 2024 Trial Testimony of Defendant's Medical Expert Dr. Sean Lager, M.D." ("Lager Mot.," ECF No. 116.) Plaintiff filed a Brief in Opposition on Sunday, March 24, 2024, ("Lager Opp.," ECF No. 117), and Defendant filed a Reply at 9:37 p.m. the evening before trial, ("Lager Reply," ECF No. 118).

C.    **TRIAL**

On Monday morning, while the prospective jurors were kept waiting, the Court attempted to take up as much of Defendant's motion as possible. The gravamen of Defendant's motion was

that is sought to either include or exclude portions of the testimony of Defendant's own witness, Dr. Lager. In Section B, Defendant sought to include testimony (pages 45:18 through 47:11 of the transcript) to which Plaintiffs' counsel had objected on hearsay grounds; in Section C, Defendant sought to exclude a line of questioning (pages 70:13 through 79:24) in which Plaintiffs' counsel asked Dr. Lager about whether the focus of his business was to "help people" or rather to make money preparing independent medical examinations for litigation; in Section D, Defendant sought to exclude portions of the testimony (pages 92:5 through 99:7 and 144:24 through 155:2) in which Plaintiffs' counsel asked Dr. Lager about a different fracture in a different patient which Dr. Lager had previously testified was "serious"; and finally, in Section F, Defendant sought to exclude Plaintiff's re-cross examination of Dr. Lager (pages 161:14 through 168:4), which Defendant contended was beyond the scope of his redirect examination. (*See generally* Lager Mot.) As will be addressed further below, the Court ruled on certain portions of Defendant's motion and, in the interest of time, asked the attorneys to work out other portions, so that the prospective jurors could be brought in.[2]

Thereafter, the jury was selected, and trial began. Defendant argues that the Court erred in a number of ways throughout the course of the trial—which arguments the Court finds are more easily addressed each in turn below in the Discussion section. After three and a half days of trial, the jury returned a verdict. As noted above, Defendant stipulated that it was negligent and that its negligence caused the incident and injuries. (*See* ECF No. 128 at *1.) As to damages, the jury awarded Mrs. Nagy $2.5 million for her "pain and suffering; disability and impairment; and loss of enjoyment of life" and Mr. Nagy $250,000 for his "loss of spouse's services; loss of companionship and comfort; and loss of marital relations[.]" (*Id.* at *2.)

---

[2] Additional arguments raised in Defendant's motion as to Dr. Lager are not at issue here.

### D.      MOTION FOR NEW TRIAL

On May 2, 2024, Defendant filed a Motion for New Trial. There are six bases upon which Defendant contends it is entitled to a new trial. Defendant contends that the Court erred in the following ways: (1) by finding that Outback spoliated evidence and granting Plaintiffs' request for an adverse inference jury instruction; (2) by permitting Plaintiffs to present previously excluded portions of Defendant's Medical Expert, Dr. Lager, to the jury; (3) by allowing testimony from Plaintiffs' medical expert, Dr. Joseph Bellapianta, M.D. ("Dr. Bellapianta") pertaining an appointment Mrs. Nagy had with Dr. Bellapianta which had not been previously disclosed to Defendant; (4) by allowing Plaintiffs to present evidence pertaining to liability, such as the condition of the floor at Outback, notwithstanding Defendant's stipulation to same; (5) by precluding Defendant from arguing that Plaintiffs' counsel referred Mrs. Nagy to Dr. Bellapianta and that Mrs. Nagy's treating physician was not testifying on her behalf; and (6) by failing to provide a curative instruction to address a comment made by Plaintiffs' counsel during his closing arguments. (MNT at 15–38.) Finally, Defendant also moves for remittitur, contending that the jury's verdict is excessive. (*Id.* at 38–39.) Plaintiff filed a Brief in Opposition, ("MTN Opp.," ECF No. 142), and Defendant filed a Reply, ("Reply ISO MTN," ECF No. 144).[3]

## II.      <u>LEGAL STANDARD</u>

Motions for new trials are governed by Rule 59(a), which provides in pertinent part: "The court may, on motion, grant a new trial on some or all of the issues . . . for any reason for which a

---

[3] Without seeking leave of Court, Defendant filed a 22-page Reply Brief, excluding the cover sheet, table of contents, and table of authorities, which exceeds the 15-page limit set by Local Civil Rule 7.2(b). Courts in this district have admonished parties and refused to consider briefs submitted in violation of the local rule without court permission. *See Lombardi v. Morris Cnty. Sheriff's Dep't*, No. 4-6418, 2007 WL 2363160, at *2 (D.N.J. Aug. 14, 2007) (refusing to consider a 24-page reply brief when there is no record that permission was requested or granted by the court). Nonetheless, the Court will exercise its discretion under Local Rule 83.2(b) and consider the entirety of Defendant's brief.

new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Third Circuit has instructed that a new trial should only be granted when "the great weight of the evidence cuts against the verdict and . . . [] a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (citing *Springer v. Henry*, 435 F.3d 268, 274 (3rd Cir. 2006)); *see also Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 128 (3d Cir. 2003) ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352–53 (3d Cir. 1991).) The decision on whether or not to grant a new trial is committed to the sound discretion of the district court. *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995); *see also Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (the authority to grant new trial committed almost entirely to discretion of trial court); *Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 445 (3d Cir. 2003) (a district court's decision on a motion for a new trial is reviewed for abuse of discretion).

## III.   DISCUSSION

### A.   JUDGE ARPERT'S SPOLIATION RULING

As noted above, on February 21, 2024, Judge Arpert determined that Outback had intentionally spoliated evidence, entitling Plaintiffs to an adverse inference at trial. (*See* Mem. Op.) By way of background, after Mrs. Nagy slipped and fell, Outback manager, Ryan Shannon ("Mr. Shannon"), initially preserved a 19-second video clip of the surveillance footage which he sent to Outback's in-house insurance adjusters. (*Id.* at 3.) However, after the insurance adjusters instructed Mr. Shannon that they needed more video, he preserved additional footage: approximately five minutes and 36 seconds before Plaintiff's fall and 22 minutes after her fall (approximately 27

minutes in total). (*Id.*) According to Mr. Shannon, Outback has a policy which requires Outback staff to perform a "bathroom check" every 15 minutes, which includes inspecting the floor as they walk through the restaurant and cleaning up any substance they notice on the floor. (*Id.* at 2.) The approximately five minutes of video preserved prior to Mrs. Nagy's fall did not contain enough time to determine whether Outback had inspected or cleaned the floor in compliance with its own policy.

Outback's surveillance camera technology operates on a seven-day loop wherein footage is overwritten every seven days. (*Id.* at 3.) Therefore, any footage that Mr. Shannon did not preserve was destroyed on October 25, 2018. (*Id.*) On October 30, 2018, Plaintiffs served Defendant with a preservation letter demanding that it preserve any and all surveillance video for the 24 hours preceding and 24 hours following the incident. (*Id.* at 3.) However, by that time, only the 19-second and 27-minute video clips were preserved, and the remaining footage had been overwritten.

During discovery in this case, Plaintiffs requested the surveillance footage. Plaintiffs were initially served only with the 19-second clip. Thereafter, Plaintiffs served Defendant with a good faith letter for additional footage, to which Defendant responded that no additional footage existed. After serving Defendant with additional spoliation interrogatories and another good faith letter pertaining to same, Defendant apparently discovered that there were an additional 27 minutes of footage and provided same to Plaintiffs. (*See* ECF No. 57 at 8; *see also* ECF No. 58 at 3.)

As noted above, thereafter, Plaintiffs filed a Motion for a Finding of Spoliation pertaining to Defendant's failure to preserve additional surveillance footage. (ECF No. 57.) On February 21, 2024, Judge Arpert determined that Defendant indeed should have preserved more video footage from the time period prior to Plaintiff's fall. (Mem. Op. at 5–7.) Judge Arpert reasoned that

litigation was reasonably foreseeable and thus Outback had a duty to preserve evidence that it knew, or reasonably should have known, would likely be requested in that litigation—which Outback, "a sophisticated business entity and experienced litigant working with an experienced claims administrator," should have known would include more than five minutes of video footage prior to Plaintiff's fall. (*Id.* at 6–7.) Judge Arpert determined that Outback—which is no stranger to slip and fall litigation and yet does not have a video retention policy in an apparent attempt to shield itself in such litigation—selectively preserved footage and thus acted with intent to deprive Plaintiffs of access to relevant video. (*Id.* at 9–10.) Accordingly, Judge Arpert held that Plaintiffs were entitled to an adverse inference instruction that Outback intentionally failed to preserve the disputed video and that the jury may presume the lost footage was unfavorable to Outback. (*Id.* at 12–13.)

Defendant now argues that it is entitled to a new trial based on Judge Arpert's ruling. (MNT at 15.) The Court finds that Defendant's challenge to Judge Arpert's decision is untimely. Rule 72(a), which addresses Magistrate Judge decisions on non-dispositive matters,[4] provides as follows:

> When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision. A party may serve and file objections to the order within 14 days after being served with a copy. *A party may not assign as error a defect in the order not timely objected to.* The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.[5]

---

[4] *See Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 340 (3d Cir. 2015) ("Discovery matters are generally nondispositive.").

[5] Furthermore, Local Rule 72.1(b)(1) also provides that "[a]ny party may appeal from a Magistrate Judge's determination of a non-dispositive matter within 14 days after the party has been served with a copy of the Magistrate Judge's order."

Fed. R. Civ. P. 72(a) (emphasis added).

Judge Arpert issued his decision finding that Outback had intentionally spoliated evidence on February 21, 2024. (Mem. Op.) The deadline for Defendant to file objections expired on March 6, 2024. However, Defendant did not timely file objections nor did Defendant otherwise seek to appeal or challenge Judge Arpert's ruling until now—after having gone to trial, stipulated to its liability, and received an unfavorable outcome from the jury. The plain language of the Rule prevents Defendant from "assign[ing] as error a defect" in Judge Arpert's Memorandum Opinion under these circumstances, and Defendant makes no argument that errors assigned in a Motion for New Trial are exceptions to the general prohibition stated in Rule 72(a).

Rather, Defendant points the court to its letter filed on March 21, 2024 in which it stipulated to liability "[i]n light of Magistrate Judge Arpert's February 21, 2024 ruling that Plaintiffs are entitled to an 'adverse inference' jury instruction based on the alleged spoliation of evidence . . . ." (*See* MTN at 8 (citing Stip. at 1).) Defendant's letter stated: "Pursuant to prevailing case law from the Third Circuit, Defendant is not waiving its right to appeal the issue of liability based on Judge Arpert's interlocutory order, which led to Defendant's decision to stipulate to liability." (*Id.*) In its Motion for a New Trial, Defendant contends that it "expressly reserved its right to file an appeal regarding the Court's earlier ruling regarding spoliation of evidence and adverse inference." (MNT at 8.) Defendant's argument misses the mark. First, by the time Defendant had "reserved its right" to appeal Judge Arpert's ruling, the deadline to file objections under the Federal and Local Rules had already passed. Second, the cases cited by Defendant in its letter are inapposite to the circumstances here.

Defendant cited two Third Circuit cases for its proposition that it had not waived its right to appeal Judge Arpert's Order. First, Defendant cited *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218 (3d Cir. 2000). In *Keefe*, the Third Circuit considered whether a party could appeal

a stipulated consent judgment when that party made explicit in its stipulation that it intended to appeal a contested issue in the litigation. *Id.* at 222–23. The Third Circuit concluded that it "is possible to consent to judgment and explicitly preserve the right to appeal . . . ." *Id.* at 223. The Court determined that when "it is clear from the record that the parties stipulated to a consent judgment with the express understanding that the party against whom judgment was entered would appeal a contested issue decided by the district court, there is no reason to hold the right to appeal waived." *Id.*

The Court finds that *Keefe* has no bearing on Defendant's belated challenge to Judge Arpert's spoliation order. *Keefe* involved a stipulated *consent judgment*—not a stipulation to liability. This distinction is significant given the reasoning underpinning the Third Circuit's decision. The Third Circuit began by explaining that appeals from judgments entered by consent are disfavored since the central purpose of a consent judgment is to settle the case without further litigation. *Id.* However, when it is clear at the outset from the parties' agreement that the losing party intends to appeal, "it is unlikely that an appeal will undermine the settlement agreement or catch a party unawares." *Id.* Unlike a consent judgment, Defendant's stipulation to liability was not by consent—in fact, just the opposite. The Court expressly instructed Defendant that, in the event that it decided to stipulate to liability, Outback should do so at the earliest possible opportunity so as to not, as the Third Circuit put it, "catch [Plaintiff] unawares." *Id.* Nonetheless, Defendant did indeed stipulate to liability just one business day before the start of trial. This is not such a case where the parties agreed to settle through a stipulated judgment by consent with the understanding that the losing party intended to appeal.

Defendant's other cited case, *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998), fares no better. In *Waldorf*, the defendant stipulated to liability and went to trial on the issue of damages. *Id.* at

607. The party then appealed the judgment to the Third Circuit, which reversed and remanded the case for a new trial on damages. *Id.* Thereafter, the defendant moved for relief from its stipulation of liability. *Id.* The district court denied the motion and held that the party was bound by its prior stipulation. *Id.* These facts have no bearing on the issue before the Court. Defendant is not, in this Motion, seeking to be relieved from its stipulation of liability. Rather, Defendant is attempting belatedly to challenge Judge Arpert's ruling on a non-dispositive discovery issue for which Defendant failed to timely file objections, let alone any objection, until post-trial.

Not only is Defendant's argument unsupported by its own cited cases, but it is undermined by Third Circuit precedent on a procedural history more akin to that presented here. For example, while the Court is not aware of any cases in this Circuit directly addressing the issue of whether failure to object to a Magistrate Judge order waives a party's right to challenge that order through a motion for a new trial, the Third Circuit has determined that failure to object to a magistrate's order results in waiver of the objection on appeal: with respect to non-dispositive matters referred to a magistrate judge under Rule 72(a), the Third Circuit "ha[s] expressly stated that a party's failure to object to a magistrate's ruling waives the party's objection." *United Steelworkers of Am., AFL-CIO v. New Jersey Zinc Co.*, 828 F.2d 1001, 1006 (3d Cir. 1987) (citing *Siers v. Morrash*, 700 F.2d 113, 114–15 (3d Cir. 1983)). The *United Steelworkers* Court reasoned that failure to timely file objections to a magistrate's orders "not only stripped the district court of its function of effectively reviewing the magistrate's order, but also frustrated the policy behind the Magistrate's Act, i.e. to relieve courts of unnecessary work and to improve access to the courts." *Id.* (citation omitted). The Court concluded that the appellants' failure to file objections as required under the federal and local rules "waived appellate review." *Id.*; *see also Cresci v. Gyess*, No. 17-2342, 2019 WL 1529964, at *1 (D.N.J. Apr. 8, 2019) ("If no party objects to the magistrate judge's order

regarding a nondispositive matter, the magistrate judge's order becomes binding unless the district court takes some action to overrule it . . . [A] party's failure to object to a magistrate's ruling waives the party's objection." (citation omitted)).[6] It appears to the Court that what Defendant is seeking is an end-run around its clear responsibility to timely object to Judge Arpert's Order.

What is more, Defendant's decision to stipulate to liability—which Defendant contends resulted from Judge Arpert's ruling—appears to have been a strategic one. Indeed, in both opening and closing arguments, Defense counsel told the jury that that Defendant "accept[ed] responsibility" because "we do not dispute that . . . what you saw in the video[] should not happen in our restaurant." (Trial Tr. Day 2 at 86; "Trial Tr. Day 4," ECF No. 140 at 472 ("There is no dispute that my client is responsible for the fact that she fell. We admit that.").) Defense counsel also repeatedly avowed that Defendant tried "streamline [the trial] for you." (Trial Tr. Day 2 at 86; *see also id.* at 87 ("as I said, we tried to streamline it for you"); Trial Tr. Day 4 at 471 (same).) Thus, not only did Defendant fail to timely file objections but also proceeded to trial at which Defendant tried to capitalize on the stipulation by conveying to the jury that Defendant was respectful, responsible, and mindful of the jury's time. Now, after receiving an unfavorable outcome from the jury, Defendant attempts to contest a magistrate judge order *nunc pro tunc*, under the guise of a motion for new trial, for which Defendant's objection deadline long passed. The Court finds, under such circumstances, Defendant's assignment of error has been waived.

**B.    DR. LAGER'S TESTIMONY**

Second, Defendant argues that the Court erred by permitting Plaintiffs to present previously

---

[6] The Court notes an out-of-Circuit case in which a district court, affirmed by the Eleventh Circuit, denied a motion for new trial in part because the plaintiff did not timely appeal the relevant magistrate judge order. *See Quevedo v. Iberia Lineas Aereas de Espana, Sociedad Anonima Operadora Co.*, No. 17-21168, 2019 WL 3804126, at *4 n.1 (S.D. Fla. Aug. 13, 2019), *aff'd*, 811 F. App'x 559 (11th Cir. 2020) (citations omitted).

redacted portions of the testimony of Defendant's medical expert, Dr. Lager. As noted above, the parties took a video-recorded testimony of Dr. Lager on March 7, 2024. At the parties' pretrial conference on March 12th, the Court instructed Defense counsel to order an expedited transcript so that any motion pertaining to Dr. Lager's testimony could be filed as expeditiously as possible. Nonetheless, Defendant filed its motion for ruling regarding Dr. Lager's testimony at 4:57 p.m. the Friday before this case was set for trial on Monday morning, March 25th.

On Monday morning, while the prospective jurors were kept waiting, the Court attempted to take up as much of Defendant's motion as possible. The Court ruled in certain portions of the motion and, in the interest of time, requested that the parties work out other portions. Thereafter, counsel for the parties apparently met in the courtroom and agreed on various redactions to Dr. Lager's testimony. (MNT at 26.) That evening, Defense counsel sent an email to Plaintiffs' counsel, which according to Defendant, memorialized the redactions that the parties agreed upon. (*Id.*; *see also* ECF No. 129-1, Exhibit C.) According to Plaintiffs' counsel, in light of his workload in the middle of trial, he took Defense counsel at his word that the email memorialized the parties' "agreement," and thus, he simply responded quickly that the edits appeared fine without thoroughly reviewing the redactions. (*See* Opp. at 13; *see also* ECF No. 129-1, Ex. D.)

Two days later, Defense counsel played a redacted version of Dr. Lager's video-recorded testimony for the jury. The Court notes at the outset that Dr. Lager was a very difficult and combative witness, who was clearly frustrated and irritated during his testimony; his demeanor and comportment was highly unusual for an expert witness. After the conclusion of the testimony, Plaintiffs' counsel requested a side bar, during which time he indicated that he believed that numerous portions of Dr. Lager's testimony were improperly and surreptitiously redacted by Defense counsel. (Trial Tr. Day 3 at 354–55.) According to Plaintiffs' counsel, many particularly

damaging comments were improperly redacted from the version shown to the jury.

The Court instructed Plaintiffs' counsel to review the excerpts that he believed were missing and ultimately excused the jury for the day to allow the parties and the Court to resolve the issue. (*Id.* at 355–62.) After reviewing Defendant's motion, the above-mentioned March 25th email exchange, and the rough transcripts from the Court's rulings on Monday morning, the Court determined that there was at least one portion of Dr. Lager's testimony that appeared to have been redacted in violation of the Court's ruling. (*Id.* at 386–89.)

The next morning, the Court received a letter from Plaintiffs' counsel, which identified nine portions of Dr. Lager's testimony which, according to Plaintiffs' counsel, were intentionally omitted in violation of the parties' agreement and the Court's ruling. (ECF No. 135-3, MNT, Exhibit F.) Plaintiffs' counsel asked for a number of remedies: (1) that those portions be played for the jury, (2) for a curative instruction that Defendant intentionally withheld portions of the testimony, (3) for attorney's fees and costs, and (4) for the Court to file an ethics complaint against Defense counsel. (*Id.*) The Court determined that, with the jury waiting, it would be too time-consuming to go through Dr. Lager's testimony line by line to determine each statement that may have been improperly redacted. (Trial Tr. Day 4 at 423–24.) The Court denied Plaintiffs' request for a curative instruction but ruled that it would "simply allow [Plaintiffs], with no instruction . . . I'm not putting my thumb on the scales here" to play as rebuttal portions of Dr. Lager's testimony that Plaintiffs' counsel believed were omitted. (*Id.* at 424*; see also id.* ("All of my admonishments of [Defense counsel] professionally and Outback have been done with a heavy heart and entirely outside the presence of the jury, and I am not going to inflame or prejudice this jury in any regard. So, subsequent to this trial, if you want to make an application, that's another story, for attorneys' fees, et cetera. But I'm not going to waste this jury's time that I kept waiting

for hours yesterday.")

Defendant now argues that permitting Plaintiffs to play portions of its expert's testimony entitles Defendant to a new trial. Both parties have attempted a recitation of a multi-hour testimony to either prove or disprove to the Court that certain portions of Dr. Lager's testimony were either improperly redacted by Defense counsel or improperly played for the jury by Plaintiffs' counsel. It would likely be an impossible task to attempt to reconstruct line-by-line the portions of the testimony which (1) Defense counsel sought to exclude, (2) Plaintiffs' counsel sought to exclude, (3) the Court ruled should be excluded, (4) the attorneys apparently agreed, outside the presence of this Court, to redact, (5) were disclosed by Defense counsel in his March 25th email to Plaintiffs' counsel, (6) were played for the jury by Defense counsel, and (7) were played by Plaintiffs' counsel as rebuttal. In any event, the Court finds such minutia unnecessary to resolve Defendant's Motion for a number of reasons.

First, as noted above, there was indisputably a portion of Dr. Lager's testimony that the Court ordered should be played for the jury, which Defense counsel on its own omitted. In its Motion, Defendant sought to exclude the entirety of Plaintiffs' re-cross of Dr. Lager as beyond the scope of Defense counsel's redirect. (Lager Mot. at 6.) On Monday morning, March 25th, when the Court first took up Defendant's motion, the Court denied Defendant's request: "I found that your redirect was quite broad and invited and opened the door to the re-cross examination." (Trial Tr. Day 1 at 48.) The Court made clear: "So all of that is in." (*Id.*) Again, the Court stated, "And the entire recross is in?" to which Defense counsel agreed, "Recross stays in. We agreed to that." (*Id.* at 50.) Nonetheless, Defendant appeared to have omitted particularly damaging portions of the recross. For example, with no explanation, but with apparent disdain and frustration, Dr. Lager left the room in the middle of the recross and had to be called by Defense counsel on the telephone to

return for the remainder of his testimony. (*See* Trial Tr. Day 3 at 387; *see also* ECF No. 116-2, Lager Mot., Exhibit A. at *42.) In addition, throughout the recross, Dr. Lager ordered Plaintiffs' counsel to go to the "next question." (Trial Tr. Day 3 at 388; *see also* ECF No. 116-2, Lager Mot., Exhibit A. at *44.) On Monday morning, the Court had specifically explained that the jury was entitled to see these portions of the testimony: "[I]n terms of demeanor and comportment, it appears that Dr. Lager left . . . Remarkably. And like he was wont to do, which I have never seen before, by the way, he would dictate to the questioner 'Next question.' . . . I've never seen that from a witness . . . And I think the jury is entitled to evaluate a person's demeanor and comportment . . . ." (Trial Tr. Day 1 at 48–49.) During a particularly heated exchange in the recross, Dr. Lager stated, "I sure hope you have a mouthful for the judge . . . What's the next question, please? Have her come back and see me next week, is that what the Court wants?" (Trial Tr. Day 3 at 388; *see also* ECF No. 116-2, Lager Mot., Exhibit A. at *44.) The Court's recollection is that none of the above was played for the jury by Defendant.

The Court, of course, recognizes that there may have been a misunderstanding between the parties as to the agreed upon redactions of Dr. Lager's testimony. Nonetheless, when the Court identified that at least some portions of the testimony had been inexplicably omitted, the Court found it appropriate under the circumstances to permit Plaintiffs' counsel to play portions of the testimony which Plaintiffs' counsel believed were removed. *See United States v. Abel*, 469 U.S. 45, 54 (1984) (A district court has "wide discretion in determining the admissibility of evidence under the Federal Rules."); *see also Leonard v. Stemtech Health Scis., Inc.*, 981 F. Supp. 2d 273, 276 (D. Del. 2013) ("Evidence should not be excluded pursuant to a motion in limine, unless it is clearly inadmissible on all potential grounds." (citations omitted)). Albeit unflattering for Defendant's case, the portions that Plaintiff played back were highly probative of Dr. Lager's

demeanor—and thus, his credibility. *See Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990) cert. denied, 501 U.S. 1217 (1991) ("a trial judge's decision to admit or exclude evidence under [Federal Rule of Evidence] 403 may not be reversed unless it is arbitrary and irrational" (internal quotation and citations omitted)); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . .").

Second, even if Defendant is correct that some portions of the testimony that Plaintiffs played back for the jury were previously excluded by the Court, the Court is free to alter its previous *in limine* rulings. *Luce v. United States*, 469 U.S. 38, 41–42 (1984) (A district court's ruling on a motion *in limine* is "subject to change when the case unfolds, particularly if actual testimony differs from what was contained in the movant's proffer. Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). After viewing Dr. Lager's recorded testimony, in the Court's judgment, the portions that Plaintiffs played back were even more probative than the Court initially anticipated to enable the jury to assess Dr. Lager's credibility.[7] The Court was entitled to alter its ruling to that effect.

Finally, the Court finds it necessary to state the obvious as it relates to Dr. Lager. Dr. Lager was *Defendant's* witness—indeed, Defendant's only witness. Defendant took the video-recorded testimony of Dr. Lager weeks before this trial began—the content and character of Dr. Lager's

---

[7] Furthermore, even if the Court erred in admitting some small portions of Dr. Lager's testimony, under Rule 61, which addresses harmless error, "No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such actions appears to the court inconsistent with substantial justice." Fed. R. Civ. P. 61. "[A]n error is harmless if it is highly probable that it did not affect the complaining party's substantial rights." *Betterbox Commc'ns Ltd. v. BB Techs, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (citation omitted). The Court finds that denying Defendant's Motion for a New Trial based on the testimony of its own expert is not inconsistent with substantial justice.

testimony was not a surprise to Defendant at trial. Defendant, after observing its own witness testify weeks before the jury was selected, could have opted not to present his testimony, but instead chose otherwise.[8] Under these circumstances, a new trial is not warranted.

### C.   DR. BELLAPIANTA'S TESTIMONY REGARDING THE 2024 OFFICE VISIT

Next, Defendant contends that the Court erred by permitting Plaintiff's medical expert, Dr. Bellapianta, to testify about an evaluation he performed on Mrs. Nagy on March 12, 2024. (MNT at 31.) Mrs. Nagy attended appointments with Dr. Bellapianta, her orthopedic surgeon and Plaintiffs' medical expert, on September 21, 2020, October 26, 2020, and June 24, 2021; these visits are reflected in three office notes. (*Id.* at 11.) Based on these visits, Dr. Bellapianta authored three expert reports, dated March 5, 2021, May 28, 2021, and March 11, 2022. (*Id.*) These notes and reports were timely provided to Defendant during discovery. The issue raised by Defendant in its Motion for a New Trial pertains to a *subsequent* office visit that took place on March 12, 2024, a few weeks before trial began. The Court finds that exclusion of Dr. Bellapianta's testimony as to this office visit was not warranted.

To explain the Court's decision, the Court finds it necessary to recount what transpired at trial pertaining to this testimony. During Mrs. Nagy's direct examination, her attorney asked her about the treatment she received from Dr. Bellapianta. (*See* Trial Tr. Day 2 at 176–77). For example, Plaintiffs' counsel asked Mrs. Nagy when she started seeing Dr. Bellapianta and what kind of treatment Dr. Bellapianta provided. (*Id.*) Thereafter, on cross-examination, Defense counsel elicited the following exchange with Mrs. Nagy:

> Q: And just so we're clear, is Dr. Bellapianta your treating doctor?
> A: He is now.
> Q: And the last time you saw him was June of 2021; am I correct?

---

[8] In fact, at one point during trial, Defense counsel stated to the Court: "[A]s we stated, Dr. Lager's testimony is what it is." (Trial Tr. Day 3 at 397.)

A: I have seen him since then.

Q: You have?

A: I have.

Q: Okay. We don't have those records.

A: Okay.

Q: How many times have you seen Dr. Bellapianta since June 24, 2021?

A: I'm not sure. But I saw him -- I don't know -- within a month or two.

Q: A month or two of this trial?

A: Correct.

Q: Is it more than one time that you saw him since June of '21, or just the one time a month or two before this trial?

A: I believe so, that I've seen him only one time since then.

Q: Understood. So, just so we're clear -- because like I said, your attorney never provided these records to us -- the last record we have is June 24, '21. So the record is clear, you saw him only one other time since then and before today?

A: Correct.

Q: And that was just a month or two?

A: Yes.

Q: Is that yes?

A: Yes.

Q: And is that because Dr. Bellapianta is going to be testifying tomorrow?

A: No. He had advised me that I see him every six months to a year, unless I was having a change in my condition. We moved, we were busy with all that, and I just let the time go.

(*Id.* at 186–88.)

The next morning, Defense counsel raised the issue with the Court that Defendant had only learned of Mrs. Nagy's 2024 visit to Dr. Bellapianta during this exchange with Mrs. Nagy on cross-examination. (Trial Tr. Day 3 at 241.) Defense counsel contended that Plaintiffs' counsel had thus violated his disclosure obligations under Rule 26,[9] and requested that the Court bar Dr. Bellapianta from discussing his 2024 treatment of Mrs. Nagy. (*Id.* at 241–43.) Plaintiffs' counsel countered

---

[9] As will be addressed further below, Rule 26 governs expert disclosures. *See* Fed. R. Civ. P 26.

that he, himself, was unaware of Mrs. Nagy's March 12, 2024 office visit with Dr. Bellapianta and thus could not have disclosed same to Defense counsel. (*See id.* at 241, 244.)

First, the Court advised Defense counsel that, rather than having impugned the credibility of Plaintiffs' counsel in front of the jury, (*see, e.g.*, Trial Tr. Day 2 at 187 ("like I said, your attorney never provided these records to us . . ."), Defense counsel should have stated his objections outside of the jury's presence, (Trial Tr. Day 3 at 241–42). Second, the Court determined that a Rule 104 hearing outside the presence of the jury should be held, during which the Court asked Dr. Bellapianta questions and permitted Defense counsel to examine the doctor.[10] (*Id.* at 246–250.) At the Rule 104 hearing, Dr. Bellapianta testified that he saw Mrs. Nagy about a month before the start of trial and that his office had his treatment note from that visit, which could be sent to him electronically. (*Id.* at 246–47.) Thereafter, the Court took a brief recess to allow Dr. Bellapianta's office to send the record—when the Court returned, Defense counsel stated that his understanding was that the record reflected that Mrs. Nagy's condition had not substantially changed since she was seen in 2021 and that Dr. Bellapianta's testimony was going to reflect that fact. (*Id.* at 249.) Under the circumstances, Defense counsel stated that he was comfortable proceeding without review of the treatment record. (*Id.*) However, the Court stated: "I am happy to wait until Dr. Bellapianta's staff gets that treatment note and so you can see it. I personally would be more comfortable with a cleaner record." (*Id.* at 250.)

The Court therefore took an additional recess, during which Defense counsel reviewed the treatment note and even discussed same with Dr. Bellapianta who pointed out for Defense counsel

---

[10] *See* Fed. R. Civ. P. 104 ((a) "The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege . . . (c) The court must conduct any hearing on a preliminary question so that the jury cannot hear it if . . . (3) justice so requires.")

what medical findings were new and which were the same as in the prior records. (*Id.* at 251–52.) Thereafter, the Court discussed with Defense counsel whether he had sufficient time to review the office note. (*Id.* at 251–59.) After some back and forth, the Court instructed Defense counsel to take as long as he needed to review the record and to inform the Court when he was ready. (*Id.* at 258–59 ("I want you to be satisfied that you have had, not five minutes, but a much [] time as you want . . . When you're ready, take your time, I'm going to tell -- with your permission, I'm going to just tell the jury that we're working on a legal issue, we haven't forgotten them, and then you'll indicate to me whether that's in three minutes or 30 minutes that you're ready to go."); *see also id.* at 260 ("I want to be clear . . . I want you to take as much time as you need . . . I'm going to leave so you feel no pressure . . . And when you're ready, indicate to the Court staff.").)

The Court then took an additional recess, and when the Court resumed, Defense counsel indicated that the first three treatment notes all reflected that Mrs. Nagy had a 1.5 cm leg length disparity while this March 12, 2024 treatment note reflected a 2 cm leg length disparity. (*Id.* at 262–63.) When asked whether Dr. Bellapianta had indicated the difference was significant, Defense counsel stated that he had not indicated as such, and "there is nothing in any of his reports that state that." (*Id.* at 263.) Nonetheless, the Court gave Defense counsel a second opportunity to examine Dr. Bellapianta under oath outside of the presence of the jury. (*Id.* at 264.) Dr. Bellapianta testified that while the leg length disparity is a "fairly accurate estimate," it is still an estimate, and that the difference could be attributed either to Mrs. Nagy's arthritis or to the fact that the measures "can be off by a few millimeters." (*Id.* at 265.) Finally, the doctor noted that the disparity was "equal to or close to significance as previously recorded." (*Id.*)

Nonetheless, Defense counsel renewed his request to preclude Plaintiffs' expert from discussing his March 12, 2024 treatment of Plaintiff. (*Id.* at 266.) The Court overruled Defendant's objection:

> You're asking for a rather draconian remedy based on inadvertence, and withholding from the jury, which is the essence of the case, which is the pain and suffering and the disability of the plaintiff, simply because of the failure to turn over a treatment note which is largely consistent with the very symptoms and issues confronting Ms. Nagy as a result of your client's admission of liability . . . I [] care that the jury has at its disposal all of the relevant, probative facts it has to determine what, if any, damages should flow [to] the plaintiff.

(*Id.* at 268–70.)

Having reviewed in detail the relevant portions of the trial transcript, the Court now turns to Defendant's argument. Rule 26 governs the parties' obligations for expert disclosures. Under subsection (a), a party must disclose expert witnesses along with written reports which include, *inter alia*, a complete statement of all expert opinions, facts or data considered by the expert in forming those opinions, and any exhibits that will be used to summarize or support those opinions. Fed. R. Civ. P. (a)(2)(A)–(B). Under subsection (e), a party is under an obligation to supplement the report as needed: "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. (e)(2). The deadline for pretrial disclosures is 30 days before trial. Fed. R. Civ. P. 26(a)(3)(B). Thus, the Court will presume that Plaintiffs' counsel's failure to disclose the treatment note—no matter inadvertent—violated the rules set forth in Rule 26.

Rule 37 governs sanctions for failure to comply with Rule 26. The Rule states that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, "the Third Circuit has made clear that the district

court should not exclude testimony if it would result in 'fundamental unfairness in the trial of the case.'" *Mercedes Benz USA LLC v. Coast Auto. Grp. Ltd.*, No. 99-3121, 2008 WL 4378294, at *2 (D.N.J. Sept. 23, 2008), *aff'd sub nom.*, 362 F. App'x 332 (3d Cir. 2010) (quoting *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156 (3d Cir. 1995)). "[T]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Quinn v. Consol. Freightways Corp. of Delaware*, 283 F.3d 572, 576 (3d Cir. 2002) (internal quotation and citation omitted); *see also ABB Air Preheater, Inc. v. Regenerative Env't Equip. Co.*, 167 F.R.D. 668, 671 (D.N.J. 1996) (collecting cases for the proposition that "[t]he Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony").

Against this backdrop, the Third Circuit has laid out four factors to guide courts in determining the appropriate sanction for failure to comply with Rule 26: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with the district court's order." *Quinn*, 283 F.3d at 577. A court also must consider "the importance of the excluded testimony." *Id.* The Court will consider each factor in turn.

As to factors one and two, the Court finds that any prejudice or surprise was cured by the Court's Rule 104 hearing. The treatment record at issue is only about three pages long. (*See* ECF 135-5, MNT, Exhibit E, at 17–20.) Nonetheless, as recounted in detail above, the Court provided Defense counsel with ample opportunity to review this record. The Court left the bench three

separate times to allow Defense counsel time to familiarize himself with the treatment note. The Court also allowed Defense counsel two opportunities to examine Dr. Bellapianta under oath about the record outside the presence of the jury, and the Court itself questioned the doctor about same. Indeed, Defense counsel represented that he was comfortable proceeding *without* reviewing the treatment note, and it was the Court that insisted that the trial should not proceed until Defense counsel took as much time as he needed to review the actual record. Dr. Bellapianta even walked Defense counsel through the record to explain it to him—a benefit Defense counsel would not likely have received in the ordinary course of discovery, especially as Defendant failed to seek to depose Dr. Bellapianta before trial but surely could have done so. Thus, even presuming Defendant had initially been surprised or suffered prejudice when Mrs. Nagy testified on cross-examination that she had seen Dr. Bellapianta one additional time in 2024, any such surprise or prejudice was cured by Defense counsel's ample opportunity to examine the record and Dr. Bellapianta outside the presence of the jury.[11]

As to factor four,[12] the Court does not find that Plaintiffs' counsel acted in bad faith by failing to disclose this information to Defense counsel. Defendant argues that "[t]he Plaintiff's attorney *obviously* had his client see his medical expert one more time prior to Trial so that the expert could provide testimony regarding Plaintiff's current medical condition." (MNT at 33 (emphasis added).) This unsupported allegation is simply belied by the record. Plaintiffs' counsel represented that he was not aware that Mrs. Nagy had seen Dr. Bellapianta again nor had he ever

---

[11] Moreover, the Court is not persuaded that this record was prejudicial to Defendant in the first instance—indeed, it appears consistent with the notes from Plaintiff's previous office visits, and Dr. Bellapianta himself testified that the 2 cm leg length disparity is "equal to or close to significance as previously recorded." (Trial Tr. Day 3 at 265.)

[12] As to factor three, Defendant does not argue, and the Court does not find, that allowing Dr. Bellapianta to testify as to one additional office visit with Mrs. Nagy disrupted the orderly and efficient progression of the trial.

seen the treatment note. Furthermore, it is self-evident that Plaintiffs' counsel did not know about Mrs. Nagy's recent visit to Dr. Bellapianta because counsel did not ask her about same during her direct examination. The Court finds that is strains credulity that a treatment record, which Defendant argues is so prejudicial to its case as to warrant exclusion, would not have been a subject of Mrs. Nagy's direct examination. Moreover, when asked on her cross-examination why she saw Dr. Bellapianta again, Mrs. Nagy stated that it was not due to Dr. Bellapianta's testimony in this matter, but rather she had been advised to see the doctor every six months to a year. Finally, the Court finds this testimony important to demonstrate Mrs. Nagy's condition close to the time of trial. As noted above, absent a showing of willful deception, extreme neglect, or bad faith, the Court should not exclude important testimony. No such exceptional circumstances exist here.

### D.   EVIDENCE OF LIABILITY

Next, Defendant argues that it is entitled to a new trial because the Court erred by permitting Plaintiff to present testimony regarding the condition of floor at the Outback restaurant. As noted above, Defendant stipulated to liability in this matter—Defendant admitted that it was negligent and that its negligence caused the incident and Mrs. Nagy's injuries. (Stip.; *see also* ECF No. 137.) Following Defendant's stipulation, the Court held a telephone conference with the parties wherein the Court advised that Plaintiffs would be entitled to present a full narrative of the incident that occurred and would not be forced to put on a "sterile presentation." (TC Tr. at 11.)

Defendant now contends that the Court erred by permitting Plaintiffs' witnesses to testify that the floor was greasy and dirty and by permitting Plaintiffs' counsel to argue in opening and closing that the floor was "disgusting." (MNT at 35–36.) Defendant argues that "[t]his testimony and argument to the Jury had no relevance once there was a stipulation of liability, other than to inflame the Jury and invoke sympathy for his client." (*Id.* at 35.) Defendant further avers that the Court erred when it prohibited Defendant from "counter[ing] this inaccurate description" by

showing the full five minutes and 36 seconds of video leading up to Plaintiff's fall. (*Id.* at 36.)

Defendant does not cite the Court to any case law or any other legal authority for its proposition, and the Court is aware of none. However, as Plaintiffs point out, (Opp. at 21), in the seminal case of *Old Chief v. United States*, the Supreme Court explained, albeit in the context of a criminal prosecution, as follows:

> In sum, the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense. A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard. A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best.

519 U.S. 172, 189 (1997); *see also In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 369 F.3d 293, 314 (3d Cir. 2004) ("A trial is more than a matter of presenting a series of individual fact questions in arid fashion to a jury. The jury properly weighs fact questions in the context of a coherent picture of the way the world works. A verdict is not merely the sum of individual findings, but the assembly of those findings into that picture of the truth.").

The Court did not err in permitting Plaintiff to present eyewitness accounts of what Plaintiffs and their friends, Mr. and Mrs. Dombrowski, experienced. Notwithstanding Defendant's stipulation, Plaintiff was entitled to present a coherent story of the incident that occurred at Outback on October 18, 2018—this includes the factual context of what occurred, such as Mrs. Nagy's testimony that she slipped on a greasy substance, the witnesses' observations that there appeared to be a greasy substance on the floor, and Plaintiffs' counsel's argument that she slipped on something greasy. *In re Diet Drugs*, 369 F.3d at 314 ("Unduly sterilizing a party's trial

presentation can unfairly hamper her ability to shape a compelling and coherent exposition of the facts."). Moreover, the damages at issue in this case depended on the jury's estimation of Mrs. Nagy's pain and suffering. The jury was entitled to hear that Mrs. Nagy fell onto what witnesses described as a dirty floor, that her hair was stuck to the substance on the floor, that she remained on the floor unable to get up until emergency services arrived, and that the experience was painful, embarrassing, and scary for her, (*see, e.g.*, Trial Tr. Day 2 at 165), in order to properly evaluate Mrs. Nagy's pain and suffering, including her emotional distress. Indeed, Outback stipulated to the testimony of its own manager, Mr. Shannon, that he found Mrs. Nagy on the floor where she appeared to be "in agony" and "in excruciating pain." (Trial. Tr. Day 3 at 273.) Accordingly, it was not beyond the bounds of propriety to allow witnesses to testify to what they observed and what Mrs. Nagy experienced at the moment of Defendant's admitted negligence. With respect to the alleged prejudice, Court finds Defendant's suggestion that the jury punished Outback for the condition of the floor, which they stipulated *caused* the incident, unconvincing.

As for Defendant's argument that the Court erred in prohibiting Defendant from playing the entire video surveillance footage leading up to the incident, by stipulating to liability, Defendant forfeited the right to contest that it was negligent and that its negligence called Mrs. Nagy to fall—Defendant cannot now argue that Plaintiff's presentation was "inaccurate." Defendant argued that he wanted to play the video for the jury to show them "what actually occurred"—namely that, in Defendant's view, no wait staff are shown spilling anything on the floor in the video. (Trial Tr. Day 2 at 195.) However, as the Court noted at trial: "Once you stipulate to liability, you stipulate to liability. The jury is entitled to eyewitness accounts of what they experienced. And so to play the five minutes before, where waiters were coming in and out, that

would have been fair game if you didn't stipulate to liability." (Trial Tr. Day 2 at 196.)[13] Thus, Defendant's assignment of error is denied.

### E.   TESTIMONY REGARDING PLAINTIFFS' COUNSEL'S REFERRAL TO DR. BELLAPIANTA AND PLAINTIFF'S TREATING PHYSICIAN

Next, Defendant argues that the Court erred in limiting Defense counsel's closing arguments by precluding argument on (1) Plaintiffs' counsel referring Mrs. Nagy to Dr. Bellapianta and (2) Plaintiff's surgeon, Dr. Stephen Schneider, M.D. ("Dr. Schneider"), not testifying at trial. (MNT at 36–37.)

During cross-examination, Defense counsel had the following exchange with Mrs. Nagy:

> Q. Okay. But, in any event, you underwent the surgery on October 19 of 2018, the next day?
> A. Correct.
> …
> Q. And Dr. Schneider is not going to be testifying on your behalf in this case, correct?
> A. That's my understanding, yes.
> Q. Do you know why your treating surgeon is not testifying in this case?
> A. I don't.
> Q. He wrote a two-page report to your attorneys. It's been marked as P-17. Are you aware of that?
> A. The surgical report, you mean, or –
> Q. No. He wrote a report, it's been marked as P-17, about your injury, your treatment, and your prognosis. Are you aware of that?
> A. No.
> …
> Q. Now, Dr. Bellapianta, told us that you wanted to get a second opinion.
> A. That's true.
> Q. Did your attorney send you to Dr. Bellapianta?
> [Plaintiffs' counsel]: Objection, Judge.

---

[13] Moreover, had Defendant been entitled to try to demonstrate, based on the approximately five minutes and 36 seconds of video footage prior Plaintiff's fall, that nothing had been spilled on the floor by Outback staff, Plaintiffs should have been entitled to the adverse inference instruction that Outback intentionally failed to preserve additional footage prior to Plaintiff's fall and that the jury may presume the lost footage was unfavorable to Outback. (*See* Mem. Op at 13.) Allowing Defendant to play the footage without the adverse inference instruction would have improperly given Defendant the best of both worlds.

> THE COURT: I will sustain the objection.
> [Defense counsel]:
> Q. How did you find your way to Dr. Bellapianta?
> A. [My attorney] had recommended him.

(Trial Tr. Day 2 at 193–94, 201.) The next morning, Plaintiffs' counsel raised objections regarding this line of questioning. (Trial Tr. Day 3 at 232). Plaintiffs' counsel contended that Defense counsel elicited a confidential communication regarding his referral to Dr. Bellapianta, which was "not only a confidential communication [but] also unduly prejudicial, with no probative value." (*Id.*) Plaintiffs' counsel also argued that Defense counsel's questioning about Dr. Schneider not testifying at trial was improper because "[t]he only inference that could possibly be drawn from that is some kind of improper motive." (*Id.* at 234.)

With respect to the referral to Dr. Bellapianta, the Court found that Defense counsel's questions were improper because the "only possible inference . . . is that [Plaintiffs' counsel] ginned this up and directed her to contrive additional medical treatment so as to hyperbolize her injuries here for this jury." (*Id.* at 236.) The Court considered an unpublished New Jersey Appellate Division decision on this issue, which was provided by Plaintiffs' counsel, the reasoning of which the Court agreed with, concluding that the line of questioning both raised privilege issues and improper "speculation and surmise." (*Id.* at 377–78). The Court ultimately precluded Defense counsel from raising these issues in closing argument.

In its Motion for a New Trial, Defendant now contends that the Court should have permitted argument on these topics because they are probative of Dr. Bellapianta's bias. (MNT at 36.) Defendant also takes issue with the fact that the Court relied on a "'non-precedential' New Jersey State Court case" in support of its ruling at trial. (*Id.* at 32.)

At the outset, the Court finds Defendant's objection to the Court's citation to an unpublished case curious in light of the fact that Defendant, in its Motion for a New Trial, provides

no case law or legal authority for its proposition that preclusion of Defendant's arguments was in error—nor did Defense counsel point the Court to any contrary authority during trial.[14] Moreover, the Court made clear at trial that it simply agreed with the reasoning of the unpublished Appellate Division case provided by Plaintiffs—not that it was bound by same. In the cited case, *Twal v. Hinds*, the Appellate Division considered a defendant's appeal based, *inter alia*, on the trial court's limitation of the defendant's cross-examination of the plaintiff. No. A-4296-06T1, 2008 WL 2776224, at *3 (N.J. Super. Ct. App. Div. July 18, 2008). The plaintiff had testified on direct examination that he had been referred to a treating physician by a friend—on cross-examination, the defendant sought to introduce a questionnaire completed by the plaintiff which demonstrated that he had consulted with his attorney prior to obtaining medical treatment from that physician. *Id.* The trial court concluded that "[t]here is absolutely [nothing] wrong about going to a lawyer and there's absolutely no reasonable fair inference that this jury should be making based upon somebody going to a lawyer, period." *Id.* In reviewing the trial court's ruling, the Appellate Division concluded, "We agree." *Id.*

The Court reiterates that it is not bound by the *Twal* decision but agrees with the Appellate Division that there is no legitimate inference that can be drawn from eliciting testimony regarding the fact that Plaintiff's attorney referred Mrs. Nagy to Dr. Bellapianta.[15] Moreover, as Plaintiffs

---

[14] The only case cited by Defendant is an unrelated criminal case from 1984 in which the United States Supreme Court determined that a trial court should have admitted testimony showing a witness's membership in a prison gang which required members to lie in order to protect one another because it was sufficiently probative of that witness's bias. *See United States v. Abel*, 469 U.S. 45, 51–52 (1984). This case has no bearing on the civil personal injury lawsuit at hand.

[15] It appears to the Court that the basis for excluding the argument in this case is even stronger than in *Twal*, where the trial court precluded what arguably appeared to be impeachment evidence to demonstrate that the plaintiff in that case had lied when testifying that she had been referred to her physician by a "friend." *Twal*, 2008 WL 2776224, at *3. Here, there is no suggestion that Mrs. Nagy was not forthcoming in her testimony about the fact that her attorney referred her to Dr. Bellapianta. Indeed, she admitted same under oath.

point out in their Opposition, to the extent that Defendant sought this testimony to demonstrate Dr.

Bellapianta's bias, Defendant had ample opportunity to explore the doctor's bias during his cross-

examination:

> Q. So you told us, in your direct examination, you were not the treating doctor when Ms. Nagy fell, correct?
> A. Correct.
> …
> Q. All right. Counsel asked you, towards the end of his direct examination, "Have you ever testified for me," and you said no. Do you remember that testimony?
> A. Correct.
> Q. Have you ever testified on behalf of his firm before?
> A. I don't recall.
> Q. Okay.
> A. I don't think so.
> …
> Q. When you've testified before, do you testify typically for the injured party, the plaintiff?
> A. Yes.
> Q. And have you testified before where you were not the initial treating physician before?
> A. Have I testified when I was not the treating physician similar to this?
> Q. Similar to this situation. You said it better than I did.
> A. Yes. Yes.
> ...
> Q. All right. Is what you're telling me, and maybe this will be helpful, is that when you do testify, it's typically on behalf of one of your patients?
> A. I don't testify much.
> Q. Oh. Okay. And how much are you being paid for your testimony today?
> A. I believe it's $5,000.
> Q. And did you also get paid for the various reports that you prepared?
> A. Yes. I'm being paid for my time.

(Trial Tr. Day 3 at 324–45.) Accordingly, in the absence of any contrary authority provided by

Defendant, the Court finds that it did not err in prohibiting the argument that the source of Mrs.

Nagy's referral to Dr. Bellapianta was Plaintiffs' counsel.

The Court now turns to Defendant's objection that the Court should have permitted Defense counsel to argue in closing that Dr. Schneider did not testify on behalf of Mrs. Nagy. In *State v. Clawans*, the New Jersey Supreme Court authorized an adverse inference instruction which, in appropriate circumstances, instructs a jury that they are permitted to draw an adverse inference against a party that fails to call a witness which that party had the power to produce and whose testimony would have been superior to the testimony used by that party. 183 A.2d 177, 81 (N.J. 1962). However, in the years since *Clawans* was decided, such adverse inferences have become disfavored. *See State v. Velasquez*, 918 A.2d 45, 54 (N.J. Super. App. Div. 2007) ("This court and others have stressed the need for trial courts to exercise caution in authorizing the inference.") With respect to expert witnesses, the Supreme Court of New Jersey has explained: "[W]hen the witness whom a party declines to call at trial is an expert rather than a fact witness, the factors that may necessitate an adverse inference charge addressing the absence of a fact witness are unlikely to be germane. Accordingly, a *Clawans* charge will rarely be warranted when the missing witness is not a fact witness, but an expert." *Washington v. Perez*, 98 A.3d 1140, 1155 (N.J. 2014). "[I]n determining whether this case presents the exceptional situation in which the absence of an expert witness warrants a *Clawans* charge," the Court should consider (1) whether "the uncalled witness is peculiarly within the control or power of only the one party," (2) whether "there is a special relationship between the party and the witness," (3) whether the witness's testimony would have "elucidate[d] relevant and critical facts in issue," and (4) whether "the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give." *Id.* at 1155–56 (quoting *State v. Hill*, 974 A.2d 403, 413 (N.J. 2009).)

At the outset, the Court notes that Defendant did not request a *Clawans* charge. However, because Defendant sought to *argue* that the jury should draw an adverse inference from Dr.

Schneider's absence, the Court, in an abundance of caution, will consider the above factors. First, there is no evidence that Dr. Schneider was in Plaintiffs' exclusive control and thus unavailable to testify for Defendant. *See Washington*, 98 A.3d at 1155 ("As the Court held in *Fitzgerald v. Stanley Roberts, Inc.*, 'no party to litigation has 'anything resembling a proprietary right' to any witness' evidence.' 186 N.J. 286, 301, 895 A.2d 405 (2006)." (internal citations omitted)). As Defendant noted in its Motion for New Trial, Dr. Schneider initially prepared an expert report in this case. *See id.* at 1155–56 (by providing an expert report to another party, the original proponent of the expert waives any claim that the information is privileged, and an adversary may call that expert at trial). Second, the Court is not aware of any information as to Dr. Schneider's availability; thus, this factor in inconclusive. Third and fourth, while Dr. Schneider's testimony may have elucidated relevant and critical facts, as the Court explained in *Washington*, "[n]othing in the record suggests that the testimony of [Dr. Schneider] would have been superior to the expert testimony already before the jury." *Id.* at 1157. Plaintiff presented evidence from her treating physician who had examined and treated her four times between September 2020 and March 2024; the Court finds that Dr. Schneider would likely have been "merely corroborative or cumulative" of Dr. Bellapianta's testimony. *Id.* (testimony of expert physician not superior when plaintiff offered testimony of her treating physician who examined her five times over three years). Accordingly, this is not such an exceptional or rare case where the failure to call an expert witness warrants an adverse inference. The Court did not err in preventing Defense counsel from presenting argument to the jury about Dr. Schneider's absence.

### F.     PLAINTIFFS' COUNSEL'S COMMENT DURING CLOSING ARGUMENT

Next, the Court turns to Defendant's argument that the Court erred in not providing a curative instruction regarding a comment made by Plaintiffs' counsel during closing arguments. (MNT at 37.) During closing, Plaintiffs' counsel stated the following:

> In some countries, it's an eye for an eye. It's a harm for a harm. It's
> a hip for a hip. If it was up to my client, she would go over there and
> break all three of their hips but she can't do that, for what they put
> her through. It's not my decision, the system we have, it's not my
> client's. This is 200 years ago our Founding Fathers -- Founding
> Parents, they decided that we are going to use money to fix wrongs.

(Trial Tr. Day 4 at 487.) Defendant contends that the comment regarding "break[ing] all three of

their hips"—which referred to Defendant's representatives and attorney—was clearly calculated

to inflame the jury, and that the Court erred by refusing to admonish Plaintiffs' counsel and

refusing to give a curative instruction. (MNT at 37–38.) Plaintiffs respond that counsel was

attempting to explain that in the United States, "money is used to compensate an individual for

harm caused by another" as opposed to in other countries were "justice is exacted measure for

measure" and admits that the comment was "not delivered precisely as intended." (Opp. at 29.)

However, Plaintiffs contend that "Defendant's argument as to the significance of these comments

is overstated and exaggerated," especially because the comment was likely unflattering to

Plaintiffs. (*Id.*)

Contrary to Defense counsel's representations, the Court *both* admonished Plaintiffs'

counsel *and* gave a curative instruction. After Plaintiffs' counsel's closing arguments, Defense

counsel asked for a sidebar, at which time he argued that the comment was inflammatory and

improper. (Trial Tr. Day 4 at 504.) The Court agreed and admonished Plaintiffs' counsel that the

comment was "improper" and "out of bounds." (*Id.* at 505.) Defense counsel asked for a curative

instruction "that the comments made by counsel are argument only and any attempt to inflame or

whatever --[.]" (*Id.*) The Court noted that the comment appeared to be "rhetorical flourish," which

was "unflattering" to Mrs. Nagy and "not helpful" to Plaintiffs' case. (*Id.* at 505–06.) The Court

also noted that it had, in both the preliminary and the final instructions, instructed the jury that

prejudice, bias, and sympathy were to have no role in their decision-making. (*Id.* at 506.)

Nonetheless, the Court asked Defense counsel what he'd like the Court to do to cure the comment. (*Id.*) Defense counsel stated: "I would simply say that any statements made by counsel directed to -- directed to the parties and their attorney should not be considered because anything -- something to that effect." (*Id.*) Based on the above discussion with the attorneys, the Court gave the following additional instruction to the jury before they retired to deliberate:

> A reminder -- and I have instructed this to you over and again, it's also in writing -- what the lawyers say in closing argument is not evidence. Evidence is as per your recollection, not what an individual lawyer believes was presented. It's what you believe was presented. And the argument of counsel in openings and in closings and, frankly, the questions themselves, is not evidence.

(Trial Tr. Day 4 at 510.)

"Courts generally have given attorneys great latitude in their arguments[.]" *Waldorf*, 142 F.3d at 628. According to the Third Circuit, "not all improper remarks will engender sufficient prejudice to mandate the granting of a new trial." *Id.* The test is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Id.* (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 208 (3d Cir. 1992)). Thus, the Third Circuit has cautioned that "at least for civil trials, . . . improper comments during closing arguments rarely rise to the level of reversible error." *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir.), modified, 13 F.3d 58 (3d Cir. 1993) (quoting *Littlefield v. McGuffey*, 954 F.2d 1337, 1346 (7th Cir. 1992)). In addition, when a court gives a curative instruction, "[g]enerally, individual elements of misconduct of counsel are insufficient to justify a new trial . . . ." *Waddington N. Am., Inc. v. Sabert Corp.*, No. 09-4883, 2011 WL 3444150, at *5 (D.N.J. Aug. 5, 2011) (citing *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391 (3d Cir. 1991) and *U.S. v. Riley*, 621 F.3d 312 (3d Cir. 2010)). In such cases, "juries are presumed to have followed the instructions of the Court"—by contrast, a new trial is warranted where the misconduct is "constant and repeated." *Id.*; *see also*

*Pierce v. City of Philadelphia*, 811 F. App'x 142, 149 (3d Cir. 2020) (upholding district court's denial of motion for new trial when an "isolated reference" made during closing argument was not a "prominent theme" throughout trial and the district court issued a curative instruction (citation omitted)).[16]

While Plaintiffs' counsel's comment during closing argument was improper, a new trial is not warranted on this basis. First, the Court gave a curative instruction right after Plaintiff's closing argument and before the jury retired to deliberate. The Court instructed the jury that "what the lawyers say in closing argument is not evidence." (Trial Tr. Day 4 at 510.) The Court also instructed the jury numerous times throughout the trial that arguments of counsel are not evidence. (*See* Trial Tr. Day 1 at 29–30 ("Nothing a lawyer says in opening statement is evidence . . . again, at the conclusion of this trial . . . the lawyers will give their summations, their closing arguments . . . It is your recollection that governs, not what a lawyer says, because it's not evidence.); Trial Tr. Day 2 at 57, 62 ("Certain things are not evidence and must not be considered by you: One, statements, arguments, and questions of the lawyers are not evidence . . . What is said in the opening statement is not evidence . . . As with opening statements, closing arguments are not evidence."); Trial Tr. Day 4 at 447 (same).) The Court also instructed the jury twice that they were not to allow sympathy, bias, or prejudice to influence their decision-making. (*See* Trial Tr. Day 2 at 56, 74 ("Do not allow sympathy, prejudice, fear, or public opinion to influence you . . . your sympathy could have no role in your decision-making."); Trial Tr. Day 4 at 452, 453 ("Your oath as jurors requires you to decide this case fairly and impartially, without sympathy,

---

[16] The discretion afforded to a trial court is particularly broad when a motion for new trial is based upon the misconduct of counsel because "in matters of trial procedure the trial judge . . . is in a far better position than [an appellate court] to appraise the effect of the improper argument of counsel." *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 366 (3d Cir. 1999) (internal quotations omitted).

passion, bias, or prejudice . . . it is your duty to weigh the evidence calmly and without passion, prejudice, or sympathy.").)

Second, the comment at issue was an isolated incident—this is simply not a case where there was a cumulative effect of multiple incidents of attorney misconduct. Courts in this Circuit have found similar isolated statements made during closing arguments insufficient for a new trial. *See, e.g., Greenleaf*, 174 F.3d at 364 (plaintiff's counsel's statement that a jury verdict for plaintiff would "send a message to [defendant]" did not approach the level of attorney misconduct found to prejudice the jury); *Hall v. Pennsylvania Dep't of Corr.*, No. 2-1255, 2006 WL 2772551, at *20 (M.D. Pa. Sept. 25, 2006) (plaintiff's counsel's statement that a jury verdict for plaintiff would light a "bonfire" under defendant is "not per se prejudicial, entitling [defendant] to a new trial"). Rather, the Court's survey of the cases in this Circuit suggests that new trials are granted where there was a pattern of attorney misconduct throughout a trial. *See Blanche Rd. Corp. v. Bensalem Twp.*, 57 F.3d 253, 264 (3d Cir. 1995), abrogated on other grounds by *United Artists Theatre Cir., Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003) (upholding district court's grant of a motion for new trial where plaintiff's counsel "pursued a pattern of misconduct from opening statement through final argument"); *Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) (upholding district court's grant of motion for new trial where there were multiple categories of improper conduct, including "repeated vituperative and insulting references to the defendants and defendants' counsel"); *Fineman v. Armstrong World Indus., Inc.*, 774 F. Supp. 266, 271 (D.N.J. 1991), *aff'd*, 980 F.2d 171 (3d Cir. 1992) (granting motion for new trial where counsel, after having been admonished by the trial court multiple times, repeatedly made improper remarks during closing arguments, including suggesting opposing counsel engaged in sexual misconduct with a witness); *Waddington*, 2011 WL 3444150, at *5 ("[Counsel's] misconduct was so constant and

repeated that if [opposing counsel] had objected to every issue, the stream of objections would have ground the proceeding to a halt . . . .").

Defendant appears to suggest that the jury's verdict itself was evidence that the jury had been inflamed by Plaintiffs' counsel's comment. However, the Third Circuit has expressly "declined to find that there is 'some level of award that would in itself evidence prejudice and passion.'" *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 464 (3d Cir. 1999) (quoting Dunn, 1 F.3d at 1383). The fact that Defendant believes the jury award is excessive does not demonstrate that the verdict was influenced by Plaintiffs' counsel's statement.

It bears emphasizing that this is not a criminal case wherein a prosecutor made an inflammatory comment about a criminal defendant; this is a personal injury lawsuit. In the context of this slip and fall case, the comment by Plaintiffs' counsel, albeit improper, appeared to be rhetorical flourish that did not warrant any additional action from the Court beyond the curative instruction given. Indeed, the Court persists in its previously-stated belief that the comment was unflattering to Mrs. Nagy herself as it portrayed her in a manner so as to not engender sympathy from the jury. Accordingly, a new trial is not warranted on this basis.

### G.    MOTION FOR REMITTITUR

Finally, Defendant moves for remittitur. (MNT at 38–39.) Defendant points out that Plaintiff has no past or future medical expenses, or past or future lost wages, and that Plaintiff completed her course of physical therapy in 2020 and has not undergone a hip replacement since. (*Id.*) Plaintiffs counter that the jury verdict was not grossly excessive. (Opp. at 32.) Plaintiffs argue that the jury was engaged and attentive, that Plaintiffs and Plaintiffs' witnesses presented "extremely well," and that Plaintiffs' expert was both knowledgeable and credible, while Defendant's expert, and only witness, was "arrogant, condescending, and at several points, quite unhinged." (*Id.* at 32–33.) Plaintiffs note that Defense counsel conceded as much during his closing

arguments: Defense counsel, himself, referred to Dr. Bellapianta as "somebody right out of central casting" and Dr. Lager, his own witness, as "the villain in the movie" with a "horrible personality." (*Id.* at 32–33; Trial Tr. Day 4 at 481, 478 ("If that's not going to inflame somebody, I don't know what would. It inflamed me. And that's the guy I paid for.").) Finally, Plaintiffs argue that Mrs. Nagy's injuries were undeniably serious and her permanent deficits significant, and that she has suffered emotional distress as a result of same. (Opp. at 35–37.)

A court has the power to grant a remittitur of a grossly excessive damages award. The Supreme Court of New Jersey has described the court's role in reviewing a motion for remittitur as follows:

> A jury's verdict, including an award of damages, is cloaked with a presumption of correctness . . . The presumption of correctness that attaches to a damages award is not overcome unless a defendant can establish, clearly and convincingly, that the award is a miscarriage of justice . . . In deciding whether to grant a new trial or remittitur based on a purportedly excessive damages [] award, the court must give due regard to the opportunity of the jury to pass upon the credibility of the witnesses . . . A judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a . . . decisive juror . . . Because a jury's award of damages is presumed to be correct, when considering a remittitur motion, a court must view the evidence in the light most favorable to the plaintiff.

*Cuevas v. Wentworth Grp.*, 144 A.3d 890, 901–902 (N.J. 2016), holding modified by *Orientale v. Jennings*, 218 A.3d 806 (N.J. 2019) (internal quotation and citations omitted). The New Jersey Supreme Court has cautioned that trial courts "must exercise the power of remittitur with great restraint . . . because in our constitutional system of civil justice, the jury -- not a judge -- is charged with the responsibility of deciding the merits of a civil claim and the quantum [] of damages to be awarded a plaintiff." *Orientale*, 218 A.3d at 817 (quoting *Cuevas*, 144 A.3d at 901.) Remittitur should not be granted "except in the unusual case in which the jury's award is so patently

excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience." *Id.* at 818

(quoting *Cuevas*, 144 A.3d at 901); *see also Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223,

1230 (3d Cir. 1989) ("While a district court has discretion in determining whether a jury's verdict

is excessive, it is undisputed that the court may not [] reduce the award merely because it would

have granted a lesser amount of damages. For the court to disturb a jury verdict, the damages

assessed by the jury must be so unreasonable as to offend the conscience of the Court." (internal

quotation and citation omitted)).

The Court finds that the jury award in this case is not so excessive as to shock the judicial

conscience. As Plaintiffs point out, Mr. and Mrs. Nagy presented extremely well; they came off as

credible and earnest, as did their friends and eye-witnesses, Mr. and Mrs. Dombrowski. None of

Plaintiffs' witnesses appeared to hyperbolize or exaggerate what transpired, or the life-altering

effect of Defendant's negligence. Plaintiffs' expert, as described by Defense counsel himself in

closing argument, was "well-spoken, very polite, well-mannered, sat down and described

everything about the anatomy of the hip and fracture and how it was worked on." (Trial Tr. Day 4

at 481.) Defendant's only witness, Dr. Lager, came off as weirdly defiant and combative and,

frankly, unreliable. The jury, not this Court, was in the best position to judge the credibility and

reliability of these witnesses and to return an award accordingly.

Even more to the point, in determining just compensation in a personal injury lawsuit, the

jury is entitled to a "high degree of discretion . . . particularly when the damages are not susceptible

to scientific precision, as in the case of pain and suffering damages . . . ." *Jastram ex rel. Jastram*

*v. Kruse*, 962 A.2d 503, 511 (N.J. 2008), abrogated on other grounds by *Cuevas*, 144 A.3d 890.

This is because there is "no neat formula for translating pain and suffering into monetary

compensation." *Id.* For example, the New Jersey Supreme Court has explained with respect to

emotional distress damages, there is "no better yardstick" than a jury's impartial judgment and experience. *Cuevas*, 144 A.3d at 905.

Here, Plaintiffs presented sufficient evidence of their pain and suffering to provide a reasonable basis for the jury's damages award. For example, Mrs. Nagy testified that, after she fell, she was in such excruciating pain that she could not move, (Trial Tr. Day 2 at 164), that she was embarrassed and scared, (*id.* at 165),[17] that she laid on the floor surrounded by people for what "seemed like forever" before she was taken away on a stretcher and brought to the hospital in an ambulance, (*id.* at 166–67),[18] that after she was taken to the hospital, she had to urinate in a bedpan, and that she was embarrassed because she could not make it into the pan, (*id.* at 168), that following her surgery, which involved inserting a pin, a plate, and numerous screws, even the pain medication did not ease her pain, (*id.* at 170–71), that during her time in the hospital following her surgery, she could not use the restroom or shower and had to be given sponge baths, (*id.* at 171–72),[19] that after she was discharged from the rehabilitation facility, she needed her husband's assistance to do everything, (*id.* at 173–74), and that she was very depressed during this time, (*id.* at 173). Mrs. Nagy, who was the primary caregiver of her grandchildren, including a grandson who suffers from both Diabetes and Celiac disease, also explained that following the incident, she was not able to care for her grandchildren. (*Id.* at 162–63, 113–14.)

Dr. Bellapianta described Mrs. Nagy's injury as a "severe fracture." (Trial Tr. Day 3 at 283.) He explained that, following an "invasive" surgery, a patient may suffer residual

---

[17] Again, the Court cites Defendant's own witness who was on the scene and found Mrs. Nagy on the floor "in agony" and "in excruciating pain." (Trial. Tr. Day 3 at 273.)

[18] Mr. Dombrowski testified that during this time, Mrs. Nagy's hair was stuck to the floor on some greasy substance and that she could not move. (Trial Tr. Day 2 at 148.)

[19] Her husband also testified that Mrs. Nagy was very embarrassed and self-conscious during this time. (Trial Tr. Day 2 at 103.)

complications including a leg length discrepancy where the "comminuted pieces [] collapse onto each other and shorten the length of the bone from its original length" and "post-traumatic arthritis" where the cartilage in the hip rapidly degenerates. (*Id.* at 286–89.) Mrs. Nagy testified about her leg length discrepancy and her subsequent arthritis, (Trial Tr. Day 2 at 175–76), as well as the impact of same on her life: for example, she used to be an avid walker and loved to help her husband on their pontoon boat, but now she feels like she's limping all the time and is unable to get on and off the boat without assistance, (*id.* at 178). She also testified about her scar, which covers her "whole [] upper thigh." (*Id.* at 182.)

Her husband, Mr. Nagy, testified about how after Mrs. Nagy fell, he ran over to her and found her "grimacing in pain" with her body "contorted," how he rode with her in the ambulance to the hospital, and how he visited her every day in the hospital. (*Id.* at 97–102.) He testified that after she was discharged from the hospital, for about a month, he had to help her with even basic movements, including using the bathroom, showering, and putting on clothes, during which time he was afraid of hurting her. (*Id.* at 104.) Over time, she started to improve, but he continued to take on all of the household responsibilities, including driving, shopping, laundry, and walking the dogs. (*Id.* at 105.) He testified that they weren't able to take care of their grandchildren which had a "terrible" effect on Mrs. Nagy. (*Id.*) Mr. Nagy testified about his wife's ongoing limp and that her injury took a toll on the hobbies they share; for example, they ended up selling their boat, which they had enjoyed using together. (*Id.* at 107.) He described Mrs. Nagy's outlook as follows: "She was always on the go before. Just – it's like put her at a slower speed, where you're not always on the lookout, you're just – it's on your mind." (*Id.* at 108.)

Defendant provides no basis for its speculation that the jury's award was "clearly based upon the inflammatory presentation of the case by the Plaintiff's counsel, and [] the errors by [the]

Court," (MNT at 39), rather than Plaintiffs' above testimony. Accordingly, Defendant has not clearly and convincingly established that the jury's verdict is a miscarriage of justice, and Defendant's request for remittitur is denied.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for a New Trial and request for remittitur

are **DENIED**. An appropriate Order follows.

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**